UNITED STATES of America ex rel. David MITCHELL, Petitioner,

v.

J. E. LaVALLEE, Superintendent, Clinton Correctional Facility, Respondent.

No. 73 Civ. 4999.

United States District Court, S. D. New York.

June 23, 1976.

Lawrence Stern, Brooklyn, N. Y., for petitioner.

Louis J. Lefkowitz, Atty. Gen., by Joseph W. Henneberry, Asst. Atty. Gen., Yonkers, N. Y., for respondent.

OPINION

STEWART, District Judge.

Petitioner, David Mitchell, alleging several constitutional deficiencies in his trial and subsequent conviction of robbery in the first degree, grand larceny in the third degree, burglary in the second degree, possession of a weapon, and criminal trespass in the first degree, seeks a writ of habeas corpus. In a memorandum decision of January 13, 1976, we dismissed Mitchell's Eighth Amendment claim for failure to exhaust state remedies, his due process claim on the merits, and ordered a hearing on the question of whether Mitchell's assigned attorney provided ineffective assistance. We appointed Lawrence Stern, Esq.[1] to represent Mitchell and a hearing was held on April 21, 1976.

In its post hearing brief, the state renewed its argument that Mitchell, who had filed a previous petition for habeas corpus relief, had not met the burden of establishing that he has not abused the writ by deliberately withholding the claim of ineffective representation in his earlier petition. See 28 U.S.C. § 2244 and *Johnson v. Copinger,* 420 F.2d 395 (4th Cir. 1969). The state raised this issue previously in its petition for reargument; we reaffirm our conclusion that it would not be in the interests of justice to deny petitioner's application on the grounds that he had raised related claims earlier.

Mitchell's previous writ application, made without the benefit of counsel, was denied without an evidentiary hearing.[2] A review of that handwritten petition reveals that Mitchell attempted to present seven alleged deficiencies, or "points of issue", which he claimed invalidated his conviction. In "point two", Mitchell protested the trial court's reappointment of the same attorney after Mitchell had discharged him for alleged negligence. Thus, we cannot find that Mitchell deliberately withheld a claim in order to bring it in a later writ if the

---

1. The court appreciates Mr. Stern's distinguished efforts on behalf of petitioner.

2. See Endorsement opinion of Judge Croake, *United States ex rel. Mitchell v. Conboy,* 71 Civ. 2324, *aff'd without opinion* (2d Cir. 1973), *cert. denied,* May 1973.

first proved unsuccessful. Rather, it is more likely that Mitchell attempted to raise questions concerning his counsel's representation but failed to adequately bring them to the district court's attention because he inartfully coupled the counsel argument with a claim that the trial court had acted unlawfully by permitting a sworn juror to withdraw without Mitchell's consent. [See pp. 8–9 of 1971 petition]. Thus, we conclude that Mitchell did not improperly and deliberately withhold his ineffective assistance of counsel claim, that the first application does not have a *res judicata* effect because there was not a full presentation of the issue [*Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963)],[3] and that we may proceed to adjudicate the question.

We turn now to the merits of Mitchell's claim that he was denied effective assistance of counsel. As discussed in our earlier opinion, Mitchell contends that his trial counsel, Emanual Molofsky, "never did adequately prepare a proper defense in his failure to contact relevant material witnesses whose names were given to him, to testify on [Mitchell's] behalf." [Petition for Writ of Habeas Corpus, p. 5]. At the hearing of April 21, 1976,[4] Mitchell gave the following explanation of what occurred in 1968.

Mitchell, a native of Trinidad, who worked as a merchant seaman, arrived in the United States in February of 1967. [H., p. 16]. In July of 1968, he was employed on the night shift at Drake's Bakery; during the days he went to the National Maritime Union Hall, located at 13th Street and Seventh Avenue. [H., pp. 17–18]. On July 21, 1968, he met a Jamaican friend, Kenny Burrell, and accompanied him to a local bar. [H., pp. 19–20]. Burrell told Mitchell that he had access to marijuana and suggested that Mitchell could get some from him. Burrell wrote his address, 157 Christopher

Street, on a piece of paper and gave it to Mitchell. [H., pp. 20–21]. At midafternoon on the following day, July 22, 1968, Mitchell went to 157 Christopher Street and rang "three bells", as instructed [H., p. 22]. A young woman (later identified as Laura Gleason) answered, heard Mitchell request Kenny, asked Mitchell what he wanted with Kenny and told him to wait. [H., p. 23]. Mitchell went upstairs; the woman told him that "no Kenny live here" and "proceeded to slam the door." [H., pp. 24, 67]. Mitchell "stopped" the door and then the woman began to scream.

Mitchell left the apartment building; on the street he was stopped by a man (later identified as Edward Murphy) and questioned. [H., p. 26]. Mitchell pulled out the paper with Burrell's address and began to explain. At that point, the police arrived and took Mitchell to the Gleason apartment; the police searched Mitchell, took the paper with Burrell's address, and then brought Mitchell to the precinct house, where he was charged. [H., pp. 26–27].

Since July 22, 1968, Mitchell has been incarcerated, first spending 15 months awaiting trial and then, after conviction, serving his sentence of from 16 years, 8 months to 50 years.

When first arraigned, Mitchell was represented by an attorney from the Legal Aid Society, whose name he cannot recall. [H., pp. 44, 46]. At later court appearances, Mitchell was represented by other Legal Aid attorneys. [H., pp. 47–48]. Mitchell saw these attorneys only when they appeared for court adjournments, and Mitchell did not have an opportunity to discuss the defense of his case with them. At one point, Mitchell attempted to retain a private lawyer, Louis Berko [H., p. 56] but after Mitchell was unable to pay the fees, Legal Aid was again assigned. [H., p. 52]. Legal Aid was subsequently relieved on

---

3. *See also United States ex rel. Lewis v. Henderson*, 520 F.2d 896, 904 (2d Cir. 1975).

4. The following abbreviations will be used to indicate the various transcripts referred to in the course of this opinion. "H" will refer to the hearing of April 21, 1976. "T" will refer to

the trial transcript of October, 1969. "Wade H" will refer to the transcript of the identification hearing held on October 5, 1969. "S" will refer to the minutes of the sentencing of November 26, 1969.

their own motion [H., p. 55] and then, sometime in the late fall of 1968, Mitchell received a letter informing him that Emanual Molofsky, a private attorney compensated by the state, had been assigned to represent him. [H., p. 27].

Mitchell first met Molofsky one week before trial. [H., p. 59]. The meeting, which involved only an introduction, lasted less than 5 minutes. [H., p. 28]. Mitchell's second meeting with Molofsky occurred the day of the identification ("Wade") hearing, when there was again no opportunity to discuss the case. When Mitchell was told by Molofsky that his trial was to begin, Mitchell protested to Molofsky that Molofsky knew nothing about the case. [H., p. 30]. Nevertheless, the trial proceeded. During the trial, Mitchell had brief conversations with Molofsky; they discussed a plea bargaining offer of ten years which Mitchell refused. Mitchell also requested that Molofsky find his friend, Kenny Burrell, and get him to come and testify. [H., pp. 31–33]. Later in the trial, Molofsky, without explaining the reasons, advised Mitchell not to testify on his own behalf. [H., p. 33]. During the two weeks of the trial, all conversations between Mitchell and Molofsky occurred in the courtroom [H., p. 33]; at no time did Molofsky visit Mitchell at the Manhattan Detention Center where Mitchell was detained. [H., p. 33].

Emanual Molofsky also testified at the habeas hearing. Molofsky stated that he was admitted to the New York bar in 1955 and had practiced before both the state and federal courts. Until May of 1975, when Molofsky became seriously ill, he did criminal trial work and had tried some 50 to 75 jury cases. Before the habeas hearing, Molofsky had reviewed Mitchell's trial minutes briefly to refresh his memory, but Molofsky had almost no present recollection of either David Mitchell or his trial. [H., p. 12]. Molofsky "believed" that he had represented Mitchell [H., p. 6] but could not recall the specifics of the charges against Mitchell [H., p. 7], whether Mitchell had given him any witnesses' names [H., p. 8], or whether Mitchell had protested about the adequacy of representation [H., p. 10]. However, Molofsky stated that it was his "general practice" to interview witnesses personally [H., p. 9], and he assumed he had done so for Mitchell's case. Molofsky did not bring any files or records of the Mitchell case to the habeas hearing.

In contrast to Molofsky's unsupported assertions that he adequately prepared for Mitchell's case as he had for all others, Mitchell's credible testimony about the lack of communication with Molofsky is supported by the trial transcript. Before the commencement of the trial, Molofsky, speaking for Mitchell, told the trial judge, the Hon. George Postel, that Mitchell wanted Molofsky discharged. [T., p. 25]. The trial court asked no questions to find out Mitchell's reasons but stated only that Mitchell had the choice of proceeding *pro se* or with Molofsky. [T., pp. 25–37]. Mitchell continued to protest during the jury selection and, after repeated warnings from the court to stop interrupting, Mitchell was bound and gagged. [T., p. 42]. On the second day of jury selection, Justice Postel met with counsel and the defendant in chambers. Mitchell told him that:

"Your Honor, I have made several applications before you asking for Mr. Molofsky to be withdrawn from the—The reasons for that, is, as I have said before. I may be wrong about Mr. Molofsky, you understand. If I am wrong about him, well, that I don't know, but your Honor I would like Mr. Molofsky to be withdrawn from the case, because I feel personally that Mr. Molofsky don't know that kuch [sic] about the case.

Mr. Molofsky has interviewed me twice, whereas we spoke very little about the case. Mr. Molofsky has no papers pertinent to my case. I have no minutes—no nothing whereof to keep up with this proceeding." [T., p. 52].

The trial court again made no inquiry about Molofsky's preparation or the validity of Mitchell's objections. Justice Postel told Mitchell:

" . . . you said you don't want to waive Counsel, and you wanted the Court

to give you Counsel, and the Court did give you Counsel, and you had better have him, that is all.

"I am not going to change your counsel." [T., p. 53].

Mitchell protested again, arguing that Mitchell was a "foreigner" who was being "railroaded to the Penitentiary". [T., p. 53]. After being instructed that his only options were to sit quietly with Molofsky or be gagged, Mitchell stopped protesting and sat without gags for the rest of his trial.

█ In addition to the fact that Mitchell claimed inadequate preparation before the commencement of his trial, there is evidence from the trial proceedings that Molofsky did not have great familiarity with the details of Mitchell's case,[5] and did not speak with Mitchell outside the courtroom during the course of the trial. [T., pp. 178–205]. Further, Molofsky made no opening [T., p. 94] and called no witnesses on behalf of the defense. [T., p. 522].[6] At the time of sentencing, Molofsky stated that he had tried to learn "something about [Mitchell's] background" to inform the court but that Mitchell had "remained mute." (S., p. 4].

Testimony from the trial transcript also corroborates Mitchell's assertion at the habeas hearing that Mitchell wanted to offer the existence of Kenny Burrell as a justification for his appearance at 157 Christopher Street on July 22, 1968. Laura Gleason testified that Mitchell had asked her if a "Kenny" lived at that address and that Mitchell had a piece of paper in his hand. [T., pp. 361, 391, 400, 416]. Edward Murphy stated that Mitchell tried to show him a piece of paper. [T., p. 452]. The District Attorney mentioned the Kenny incident in both his opening remarks [T., p. 90] and in his summation [T., pp. 588, 593], and the court, when marshalling the evidence, described Kenny as well. [T., pp. 633, 636]. Molofsky himself mentioned Kenny in his cross-examination but never stated Kenny's name correctly.[7]

█ In conclusion, because we found Mitchell to be a credible witness and because his assertions are supported by the trial record and are not specifically disputed by Molofsky, we conclude that Molofsky failed to prepare Mitchell's case for trial and therefore provided inadequate assistance of counsel.[8]

**5.** In our earlier opinion, we noted that Molofsky was active during the trial. We retain that view; Molofsky did cross-examine witnesses, object to testimony, seek severances of the charges, and claim prejudice from the introduction of certain items into evidence. However, we note that Molofsky's performance at trial may be attributable to familiarity with defense tactics and does not alter our finding that Molofsky knew little specifically about Mitchell's case and had not prepared adequately for it.

**6.** Petitioner also argues that Molofsky urged him not to take the stand based upon an inaccurate legal conclusion as to what of his past history would be admissible on cross-examination. [See pp. 24–28 of petitioner's memorandum of May 26, 1976]. However, we note that the trial judge told Molofsky that, in addition to previous criminal convictions, the judge would permit questions about "any immoral, indecent or visious [sic] acts that the prosecution has knowledge of and whether or not he committed them." [T., p. 515]. Further, the decision to put a defendant on the stand involves questions of trial tactics upon which courts generally do not base conclusions of ineffective assistance

of counsel. *See, e. g., United States v. Garguilo,* 324 F.2d 795 (2d Cir. 1963).

Whether Molofsky's advice here can be described as tactical is questionable, for there is credible testimony that Molofsky never interviewed Mitchell and thus, had little or no information upon which to make a strategical decision. [See H., pp. 105, 109, S., p. 4]. Compare *United States v. Yanishetsky,* 500 F.2d 1327 (2d Cir. 1974), *United States ex rel. Walker v. Henderson,* 492 F.2d 1311 (2d Cir. 1974), *cert. denied,* 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144 (1974), *United States ex rel. Sabella v. Follette,* 432 F.2d 572 (2d Cir. 1970), *cert. denied,* 401 U.S. 920, 91 S.Ct. 905, 27 L.Ed.2d 822 (1971), and *United States v. Sangemino,* 401 F.Supp. 903 (S.D.N.Y.1975).

**7.** Molofsky asked about a "Kenny Barret" twice. [T., pp. 475 and 500].

**8.** It is regrettable that the trial court failed to discharge its obligation of inquiring about the cause of Mitchell's dissatisfaction with his attorney. *See United States v. Morrissey,* 461 F.2d 666 (2d Cir. 1972) and *Brown v. Craven,* 424 F.2d 1166, 1170 (9th Cir. 1970). It is un-

■ However, a district court's review of the adequacy of representation does not stop with a finding that preparation was insufficient, or, as we believe here, totally lacking. Rather, the court must ascertain whether "there has been gross incompetence of counsel and that this has in effect blotted out the essence of a *substantial* defense either in the District Court or on appeal.'" *United States ex rel. Testamark v. Vincent,* 496 F.2d 641 (2d Cir. 1974), *cert. denied,* 421 U.S. 951, 95 S.Ct. 1685, 44 L.Ed.2d 105 (1975) (emphasis in original, citations omitted).[9] In order to evaluate whether a substantial defense has been lost, the district court must look to the strength of the prosecution's case and to other information presented by the petitioner to attempt to ascertain what a more effective advocate could have presented.[10] *See United States ex rel. Crispin v. Mancusi,* 448 F.2d 233 (2d Cir. 1971), *cert. denied,* 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 288 (1971), *United States v. Katz,* 425 F.2d 928 (2d Cir. 1970), and *United States ex rel. Thomas v. Zelker,* 332 F.Supp. 595 (S.D.N.Y. 1971).

■ Here, Mitchell was charged with several crimes relating to three separate incidents.[11] The witness which he now asserts could have given exculpatory testimony only had knowledge of the third incident, involving an alleged assault on Laura Gleason. Assuming that Mitchell had had adequate counsel, and that Burrell had been found, had testified on Mitchell's behalf, and had been believed by the jury, Mitchell would still have had to explain his involvement in the two robberies of July 8 and July 9. In both, Mitchell was accused of robbery in the first degree, grand larceny in the third degree, and burglary in the second degree.[12] The two victims testified at both the pretrial identification hearing and at the trial and each identified Mitchell as their assailant. [Wade H., pp. 50, 68, 93; T., pp. 140, 218].[13] The victims also describ-

likely that the trial court would have found that this petitioner, who had already spent 15 months incarcerated awaiting trial, was seeking to delay the trial without good cause. Compare *United States v. Calabro,* 467 F.2d 973, 978 (2d Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973), *rehearing denied,* 411 U.S. 941, 93 S.Ct. 1891, 36 L.Ed.2d 404 (1973).

9. An alternative statement of the standard, cited most frequently and considered by some to be more stringent, is that enunciated in *United States v. Wight,* 176 F.2d 376, 379 (2d Cir. 1949). "The proof of the efficiency of . . . assistance lies in the character of the resultant proceedings . . . . A lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." *See also Lunz v. Henderson,* 533 F.2d 1322, 1327 (2d Cir. 1976). The variation of standards of denial of assistance of counsel in the different circuits is discussed in *McQueen v. Swenson,* 498 F.2d 207, 213–218 (8th Cir. 1974) and at 43 Fordham L.Rev. 310 (1974) and 65 J.Crim.L. 302 (1974). Under the test articulated by the Third Circuit in *Moore v. United States,* 432 F.2d 730 (3rd Cir. 1970), a retrial of Mitchell might be required. A recent published opinion of the Second Circuit, *United States v. Devins,* 538 F.2d 315, Dkt. # 76–1007, suggests that this circuit might entertain arguments to "relax our strict 'mockery of justice, shock the conscience' approach to allegations of incompetence of counsel."

10. We must frankly admit that we are troubled by such a rule, for, once a finding of inadequate counsel has been made, it must be realized that the trial transcript cannot reveal the case in a light favorable to the defendant. *See, e.g., United States ex rel. Thomas v. Zelker,* 332 F.Supp. 595, 601 (S.D.N.Y.1971).

11. The full indictment is at pp. 648–651 of the trial transcript.

12. Mitchell was also charged with possession of a dangerous weapon on July 8, 1968.

13. Mitchell claims that the identifications were made under impermissibly suggestive conditions and that, had Burrell been presented to explain the third incident, had the other two victims been properly cross-examined, and had Mitchell been properly advised and taken the stand, the jury would have concluded that the identifications were mistakes. However after a hearing on the constitutionality of the identifications, the state court found them proper. "The Court is satisfied beyond a reasonable doubt by clear and convincing evidence that in no wise [sic] has the Constitutional rights of the accused been violated nor would they be violated by permitting the witnesses to testify and make an in-court identification of the defendant. . . . " [Wade H., p. 128]. Further, we note that, while the identification procedures were not optimal, both victims spent 15–30 minutes during the daytime in close physical proximity to their assailant and

ed identifying features of Mitchell such as his accent, clothing, jewelry, scar, and brand of cigarettes. Mitchell's wife testified at the trial and linked those characteristics to Mitchell. [T., pp. 283–317]. In sum the prosecution brought much evidence before the jury to connect Mitchell with the July 8th and July 9th robberies.

In contrast, Mitchell offered no testimony at the habeas hearing, which indicated that he had had a substantial defense to these charges. He stated only that he had never seen the victims before his trial [H., p. 36] and would have stated so at his trial if he had had the opportunity [H., p. 111]. Mitchell had no present recollection of the events of those days and was not aware of any witnesses who could offer testimony favorable to him. [H., pp. 68–69].

Mitchell was found guilty of all counts except the last, which had charged him with sexual abuse of Laura Gleason. [T., p. 651]. He was sentenced to two consecutive terms of 8 years, four months to 25 years for his robbery and grand larceny convictions and to concurrent, shorter terms on the other counts. [S., pp. 4–7]. As Mitchell has not shown us any substantial defenses to the first seven counts of the indictment which were thwarted because of Molofsky's inadequate trial preparation, we must deny the application for a writ of habeas corpus.[14]

SO ORDERED.

---

both independently selected his photograph from a group of eight pictures shown to them. Thus, we do not believe that evidence presented by Burrell could have afforded Mitchell a "*substantial* defense" to the charges relating to the July 8th and July 9th robberies.

14. We void Mitchell's conviction for criminal trespass on count eight because, as to this count, the testimony of Burrell coupled with Mitchell's own testimony, would have presented a substantial defense. However, as Mitchell received a one-year sentence to run concurrently with the other counts for this conviction, its vacature does not result in a release from custody.